The Honorable Judges of the United States Court of Appeals in and for the 7th Judicial Circuit. Heery, heery, heery. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning ladies and gentlemen. The first case this morning is Walter Dean v. National Production Workers and Ms. Rowe, you can start. Ms. Rowe? Which is which? Ms. Rowe, do you have your, can you hear me? Good morning. Ms. Rowe? Yes. Can you hear me? And now, and you may begin your argument. Thank you. Good morning, Your Honors. Counsel, may it please the Court. My name is Elizabeth Rowe and I represent the plaintiff appellants in this case, Walter Dean and Dean Wallenstein, and who request that this Court reverse the lower court's dismissal of six of their claims under the Employee Retirement Income Security Act, which were dismissed. There's a little bit of problem with static. Does anybody else have that problem? Hearing it all right, okay, proceed. Okay, I'll do my best to make it a little clearer. The lower court dismissed the six claims on a motion to dismiss. Today, I would like to highlight how the allegations complained of are precisely the type of conduct that ERISA was enacted to prevent, and how plaintiff's claims fall squarely within the rules that ERISA empowered plaintiffs and participants to bring to protect their assets from misuse and mismanagement by planned fiduciaries. The district court's dismissal was irreconcilable with the overarching purpose of the Act and with Rule 8 notice pleading standards. The facts here are that the officers of the National Production Workers Union have long operated the severance plan as a personal cash cow to supplement and subsidize union salaries and salaries of union relatives. Plaintiffs and co-workers, their co-workers at Parsec Incorporated back in 2012 had concerns leading them to negotiate the creation of the 401k plan in which they would begin contributing from 2012 forward. The union at that point had insisted that their contributions prior to 2012 stay in the severance plan. And then in 2017, the defendants, the plaintiffs became fed up following a Department of Labor investigation that revealed over $800,000 in prohibited transactions, which consisted of loans from the severance plan, including plaintiff's individual accounts into the National Production Workers Welfare Fund. The DOL investigation also revealed over 10,000 accounts that the defendants had failed to pay out to participants. The decertification campaign ensued. And during that campaign, the union trustees, union trustees, fiduciaries of these plaintiffs threatened them that if they decertified the union, they would not be permitted to transfer their vested retirement accounts into their new plan. They now participate in the Teamsters 401k plan. And then defendants have lived up to that threat. It's a conflict-tainted threat. They also refused to terminate the 401k plan, despite the fact that Parsec, the only contributing employer, withdrew from the plan in 2017. Defendants claim they cannot transfer assets based on plan terms. Their contention is that the plan terms prohibit them from transferring assets if plaintiffs decertify the union. But defendants control the plan terms. They can and they should allow for a transfer of assets in these circumstances in order to fulfill their obligation to the participants to maintain their accounts only for the exclusive Defendants refuse to because they have two clear incentives. By continuing to hold on to plaintiffs' retirement accounts, they can continue to skim from the top of those and pay for these substantial salaries of union officers and relatives of fiduciaries. By continuing to hold on to the Parsec employees' retirement accounts and these other 10,000 accounts that they refuse to transfer, they can continue to skim from the top of those in order to pay administrative expenses that go substantially towards these salaries of union officers and to their relatives. Their second incentive is to punish these employees for decertifying the union and to send a message to remaining members that if they have any objections or issues with how the plan is run, that decertification isn't going to be a worthwhile pursuit for them. The bottom line is that it's defendants who are the only individuals standing in the way of a transfer of assets here, and they do so with several blatant conflicts of interest. They can't identify a single reason why it's in the best interest of participants to continue holding on to plaintiffs' fully-funded, fully-vested individual retirement accounts. Instead, if plaintiffs could transfer these accounts into their new plan, they could reduce their administrative expenses and have all of their retirement accounts contained in one single plan. These are precisely the type of claims and circumstances that Congress meant to protect against, as is clear from the well-documented legislative history of ERISA. For example, recently in Davis v. Richards, this court held that ERISA was enacted in response to Senate investigations into widespread looting of plan funds through sweetheart deals, kickbacks, and cronyism. And the court stated in that case that it would be odd if ERISA operated to shield similar fraudulent activity in that case. Indeed, it would be an odd result here, too, where plaintiffs, arguably even more so than the plaintiffs in that case, are alleging the type of looting by a union that ERISA was enacted to protect against. Not only did Congress empower participants to bring these type of claims, Congress also empowered courts with broad equitable powers to fashion equitable relief. And courts in similar circumstances, very similar to this, in welfare plans, multi-employer welfare plans, have used their equitable powers to allow for a transfer of assets even where a planned document otherwise claims to prohibit it. In those cases, they do so based on the equities and the notion that the fiduciaries are supposed to maintain the assets only for the exclusive purpose of participants. Ms. Rowe, isn't one fundamental challenge for us there that welfare plans are very different from the kind of defined contribution plan here, and that the courts have described those differences and how it's much more of a risk in the welfare plan context because you've got everybody's money pooled together, so it's much harder. It's a different situation than these individual accounts where people are just entitled to the money in their individual accounts. Yes. So in these welfare plan cases, it's more of a risk to actually transfer those assets because there's an assumption that a certain amount of participants, they don't all use these benefits to the same degree as other participants. They're not guaranteed any certain amount of benefits. So by transferring assets to a new plan, they actually are reducing the amount of assets available to the remaining participants. I think that the analysis is even easier in the context of a defined contribution plan. We don't know of any other cases that have ever considered this issue, but it's a much simpler analysis because there are no funding issues. All of these contributions in plaintiff's accounts and those of parsec employees have been contributed exclusively for their benefit into their own accounts, which are, the amount they're entitled to is delineated. It's clear. A transfer to a new retirement account would result in a complete transfer of those liabilities and it could even reduce, for all we know, it could reduce the expenses of the National Production Workers Union. So I think that those cases, they stand for the proposition that this is a proper use of the court's power to provide that sort of relief. And as far as we know, this is a case of first impression as it concerns a defined contribution plan. But it's very common in the employment to leave your employer or, and move your assets to the new plan in which you participate. The only difference here is that plaintiffs haven't left their employer, they've left the union, which claims to sponsor the plan. I get that there's a should here, that, you know, from plaintiff's position, the plans really should allow a transfer of assets and it would be in the, in the dean, Mr. Dean and his colleagues' best interest. How, how do we as a court do that in the face of the exact terms of the plan that only allow rollover in cases of severance death, age 65, in the face of these ERISA provisions that don't seem to apply here, in the face of IRS provisions that we've already held don't apply in the ERISA context? How do we get, how do we get to a can when this is, by its terms, left to the discretion of a plan? Well, you get there the same way the courts in cases like Greenbrier, LA, Head Start, these cases all dealt with the restriction in the plan that said you could not transfer these assets, but it involved a analysis weighing the equities to determine whether it really is in the best interest of participants to stay in the plan and what the harm would be to the other participants. Here they're really, the harm to the other participants isn't really relevant because they at no point are they ever entitled to any of these benefits. The only people who are entitled to these assets are the plaintiffs who are requesting a transfer of these assets. And the court is permitted to, under the equitable powers in Section 502 of ERISA, to take whatever measures it deems necessary to protect the equities here. And so, you know, and I'd like to reserve the rest of my time, but I'll just conclude that plaintiffs haven't, or the defendants can't identify a single legitimate reason for enacting this restriction to the extent that they have. In the 401k plan, I would also like to just note that the 401k plan does not contain that same restriction that the SPD does in the severance plan. And the 401k plan states by its terms that it should have terminated when there were no longer any contributing employers with an obligation to contribute, which happened in 2017 when PARSEC withdrew. So that plan term restriction doesn't even apply to the 401k plan, in our opinion. But if there are no further questions, I would like to reserve the rest of my time. Thank you, Ms. Rowe. Ms. Mashett? Thank you, Your Honor. May it please the Court, Samantha Mashott for appellees. And I'd like to start by addressing a couple of the points that Ms. Rowe raised in her opening statement. And I'm happy to address any questions the Court has, of course. I think one fundamental problem with plaintiff's arguments in this case is that under ERISA, we can't look at the fiduciary's fiduciary obligations from the perspective of a small subset of participants, because under ERISA, the trustee's fiduciary obligations run to the plan as a whole. And that is something that this circuit and other circuits have consistently recognized. That's in Russell's Supreme Court's decision, Carpenter's, this Court's decision. And so fundamentally, and I guess in the second fundamental problem with plaintiff's arguments in this case, is that they're constantly challenging plan design, and it's equally well established that that is not something, that simply enforcing the plan terms as written is not something that can give rise to a breach of fiduciary duty, which is exactly what is happening here. And plaintiffs haven't identified any basis to find that the plan terms are unlawful or that there's anything else that would entitle them to override the plan terms. And I'd like to, secondly, I'd like to address sort of these self-dealing allegations, because again, I think plaintiffs are making arguments that are contrary to both ERISA and contrary to the record before the court, including documents incorporated by reference in the  And I think that's something that we should be able to consider. There's a lot of mudslinging here by the Teamsters lawyers that tries to paint conduct that ERISA explicitly says is okay as something sinister, when it's just not reasonable to infer that it is. So let's take, for example, the fact that the plan is run by trustees who, some of the trustees also are affiliated with the union. Well, in Section 408C3 of ERISA, which is codified at 1108, ERISA specifically says there's nothing wrong with fiduciaries also serving as officers of a party in interest, which can include a union. So ERISA specifically contemplates there's nothing wrong with that. There's nothing wrong with paying salaries, again, as long as they're reasonable. So here, plaintiffs can't just say, well, they paid a salary to someone who's a member of the union because there's literally nothing wrong with that. Well, can I ask about the salaries? Because you do argue that Mr. Meltraker's salary, it's high because it was high and then he got a raise. And so there was a justification there. You don't make any argument about Mr. Sinise's salary, do you? We do, and I think it's this, there's no basis in the complaint to infer that Mr. Sinise's salary is too high. All they've alleged is that, you know, the plan paid salaries, but they haven't offered a reasonable benchmark, any benchmark from which this court could infer that the salaries are too high. About his raise specifically? Oh, the raise? Again, there's no reasonable basis, no facts in the complaint from which we could infer that the salary was improper because it was specifically approved by the DOL. Mr. Meltraker was promoted, and that's shown in the DOL consent order, and he was promoted to a position that combined what was previously two separate roles into a And Mr. Sinise, and what about Mr. Sinise? I think the problem there is that there's just nothing. The complaint, literally the argument or the allegation in the complaint is that Mr. Sinise received a salary and that he's a member of a union, but under a risk, or I don't actually, I'm sorry, I'm not even sure that there's an allegation that he's a member of a union because he's not. Did he receive a raise? No, I don't believe Mr. Sinise received a raise. All right. But even if he did, I think that the same argument applies, raises are common, raises, you know, this is part, you need people to administer a plan and you've got to pay the people. So you have to identify some reason to think that the raise was improper. So I think this would be a different case if plaintiffs had, if plaintiffs had offered plausible allegations that there was some other plan that was paying similar people, people performing similar roles, higher salaries, and that some, there was some reason to think that the role, the duties performed by people for another plan were similar. Of course, plaintiffs don't need, you know, they can't possibly plead facts that they would need discovery to get. I'm not suggesting that that's their pleading burden, but their pleading burden is, you know, minors recognizes, for example, this court is recognized in HECR is, is to use the public materials, which are like all the information that a RISDO requires these plans to report in form of hundreds and other materials to the DOL to, to create a story that holds together and that provides some circumstantial evidence to support an inference of disloyalty. And the problem is that plaintiffs haven't, you know, haven't used those public record materials that are available to them to identify any reasonable basis to think that these here are too high. And the reason they haven't done that is twofold. First, they haven't identified a comparable plan at all, which is a problem. And even if there was a comparable plan, they haven't identified a metric, a comparison metric that gives rise to any reasonable inference that fees are too high. And without something there, without some basis to think, and I'm happy to get deeper into either of those issues, if you're interested, but without some basis to think that the fees are too high, the mere fact that someone got a raise or that someone received a salary, especially when we have this against the backdrop of the DOL approving all this, in the timeframe we're talking about, the DOL was very involved in the plan, had removed all the trustees that, you know, were accused of wrongdoing and had replaced them with trustees that were, that the DOL specifically approved and the DOL approved the reorganization of the plan. And a lot of what plaintiffs are challenging, I mean, virtually everything plaintiffs are So I think when you have those facts in the record and incorporated in the complaint, it's just not plausible to think that there's something nefarious going on here. I think you need, you need more. Let me ask, let me ask you about this 401k. I think that defendants are absolutely right that they get to maintain the money in the 401k account by the terms of the plan until the trust fund is fully distributed or terminated. Okay? And so defendants are saying, you know, there are other contributing employers to this 401k and you all point to a form, form 5500. But I look at that, it suggests to me there are other active participants in the plan. It doesn't necessarily mean that there's another employer contributing to the plan. So at this stage, if we're supposed to take the facts as true and construe inferences in favor of the plaintiff, what do we do there if Parsec was the only employer contributing to that 401k plan and they're the only participants? How do we get around this anti-annulment provision? At least at this motion to dismiss stage. Sure. So I think there's two independent grounds here, Your Honor. First, if you look at Appendix 112, which is the form 5500 on which plaintiffs the 2017 form 5500 for the 401k plan. It does, it not only shows an increase in the number of active participants at the year end, but it shows a contributing employer. And I can just tell you, you cannot have active participants without a contributing employer. That's what it means to have active participants. It means that someone is actively contributing on their behalf to the plan. So there's no way to read this document, Appendix 112, without coming to the conclusion that there was a contributing employer at year end. And this court is entitled, and the plaintiffs have put the form 5500s at issue and argued, and we agree that they are something that the court can consider at this stage. And if you look at, and in fact, other courts have, for example, in White and Chevron courts looked at form 5500s at the motion to dismiss stage. In HECR, this court looked at other public filings at the motion to dismiss stage. And if you look at the 2018, 2019, 2020, I mean, the plans continue to operate, the 401k plans continue to operate this entire, you know, in the five years since this document, plaintiffs are relying on, and that's because they have contributing employers. So I do think that the judicially noticeable, and documents judicially noticeable and incorporated by reference, just conclusively preclude this basic premise of plaintiff's argument. But independently, I think even if you thought there was an automatic termination under the terms of the plan, that still doesn't get you to distributions. Again, under the plain terms of the plan, I think plaintiff's arguments to the contrary kind of misunderstand what a termination means for purposes of ERISA. So when there's a termination for purposes of ERISA, what ERISA is concerned about is the fact that employers don't try to take the money back. So the benefits have to vest. They have to be non-forfeitable. They have to be, if it's an individual account plan, they need to be allocated to accounts. You know, those are the provisions clients rely on. That's what they require. Nothing requires distribution. There's just no basis in ERISA for concluding that. And in fact, it's important to note that when ERISA wanted to provide for distribution, when Congress wanted to provide for distribution, they did. That's seen in like 1415, for example, with respect to defined benefit plans. Welfare plans also have terms about distribution. And it's the basic principle of ERISA that we don't read provisions into ERISA that aren't there. So turning to the plan terms themselves, so ERISA doesn't require distribution upon termination. The plan terms themselves, likewise, specifically contemplate that the funds can remain in the plan and be distributed under the terms of the plan when a plan terminates. So that's in section 9.2 specifically says the funds remain in the plan unless and until the trust is fully distributed or the trust is terminated. I think that's the language you were looking at. And then if you look at the trust agreement, which is at Supplemental Appendix 20, again, the trust agreement specifically contemplates that a plan can terminate, but that doesn't mean the trust terminates. And until the trust terminates, the assets can be maintained for the participants' benefits in their accounts and be distributed under the terms of the plan. So is that responsive to your question? Yeah, so, yeah. So I guess, you know, and I think one other point I wanted to address is that this court is absolutely correct to recognize the differences between welfare plans, for example, and defined contribution plans and defined benefit plans. And what plaintiffs are overlooking in their analogies to those other plans, I think, is the fact that the courts in all those cases were concerned about forfeiture. And so to the extent there's any differences between, you know, Caterino and Ganton and O'Hare and Trapani in the present case, if anything, those differences cut in favor of defendants' view because in all those cases there was a forfeiture and the courts were trying to justify why it was nonetheless, even if benefits are being forfeited, it was nonetheless not a breach of the trustee's fiduciary obligation to retain the benefits in the plan. And here the answer is even clearer because there's no forfeiture. The benefits are literally continuing to be held and maintained in participant accounts for their exclusive benefit and they're going to be distributed as soon as they're entitled to a distribution, as soon as a severance occurs under the terms of the plan. And finally, I'll just point out, we do have legitimate here. The plan does have absolutely legitimate reasons and these are not attorney's speculation. These are reasons recognized by courts maintaining the stability of plans and, you know, making sure that we're holding assets for the benefit of the whole plan and not just individual participants. So I see I'm out of time and I'll turn it back over to Ms. Rowe. Thank you, counsel. Ms. Rowe? I'd like to point out that a lot of those arguments that Ms. Maychak made were questions, arguments about questions of fact that aren't appropriate for, to be resolved on a motion to dismiss. The question of whether the salaries paid to these union officers, which are per se prohibited transactions under 29 U.S.C. 1106 are questions of facts. That's a defense they have, but that's an affirmative defense, as this court said in Allen v. Greatbach. And we did elect that Mr. Sinise received a $20,000 raise in 2017. There's also a lot of talk about this DOL settlement and what it did or did not approve. The only thing that this DOL settlement does is it sets out the terms that in very generic terms without mentioning any names of who can be hired or any salaries of what the plan is supposed to do. There's absolutely no evidence in the record that the DOL is aware of who they selected for any of these positions or salaries they paid them. We have no idea if the DOL approved them to continue using the accountant who had been their accountant for years leading up to their discovery of $800,000 of prohibited transactions. So that too is a question of fact that shouldn't be considered by the court on a motion to dismiss. And with regard to the termination of the 401k plan, they're alleging that in 2018 they've attached a 2018 form 5500 stating that there's one contributing employer in that year. But that wouldn't negate an automatic termination under the terms of the plan in 2017 when Parsec withdrew. We've also pointed out that their form 5500 contained false information. For years, year after year, they were not identifying that these payments to union insiders were indeed payments to union insiders. They listed all of those individuals, at least seven of them, as having no relationship to the union. So I don't think that their form 5500s could be taken at face value in any respect. And all of this gives us the right to discover more information. The participants of these plans are entitled to some transparency over how their plans are operated and what the expenses are. And they've alleged very serious concerns. And they allege these concerns. They brought these to the attention of defendants well before filing a lawsuit and for information that would justify any of these expenses. And the defendants just outright refused to provide them any information. They had no other means of getting any insider information about how defendants came at setting any of these salaries without that insider information, which Alan V. Grapefont also said you don't need in order to allege a fiduciary duty claim. So, you know, and so I heard at the end, Ms. Maychak said that there is a good reason they're holding best interest of participants. I didn't hear anything other than just lip service to that. We haven't seen any decision that they've ever made where they've evaluated whether or not that's true and what the effect of the withdrawal would be on participants. And if they were to consider that, it would be important to consider the DOL's requirement that they also transfer 10,000 accounts of other participants and determine how much of that impact on the remaining participants was attributable to plaintiffs here versus the other 10,000 they're already supposed to be transferring anyway. So, you know, in conclusion, we've stated claims that the courts have recognized give a right to relief and we request that it be remanded for further proceedings. Thank you. Thanks to both counsel and the case is taken under advisement.